**Johnny Robert JACKSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–95–388–CR.**

Court of Appeals of Texas,
Corpus Christi.

Feb. 20, 1997.

Kevin P. Hanna, Corpus Christi, for appellant.

Carlos Valdez, District Attorney, James D. Rosenkild, Assistant District Attorney, Corpus Christi, for state.

Before SEERDEN, C.J., and YAÑEZ and RODRIGUEZ, JJ.

**OPINION**

RODRIGUEZ, Justice.

The jury found Johnny Robert Jackson, appellant, guilty of felony injury to a disabled individual, and the judge sentenced him to life in prison. By his sole point of error, appellant complains that the jury's rejection of his insanity defense was against the great weight and preponderance of the evidence. We reverse the trial court's judgment and remand for a new trial.

Late one winter night in 1995, appellant wandered into South Park Manor Nursing Home through the back door. He was bare-

foot, unshaven, and disheveled. The nurses and nurse's aides who encountered appellant asked whether they could help him, but he did not respond. Instead, appellant immediately became violent. He chased the nurse's aides and fought with the nurses. Appellant grabbed a fire extinguisher that was mounted on the wall and "then just started waiving it pretty erratically over his head." At this moment, the complainant came out of his room. Appellant hit the complainant on the head with the fire extinguisher, and the complainant was seriously injured.

■ After appellant was arrested and charged, the court appointed Dr. Christopher Klaas, a psychologist, and Dr. Joel Kutnick, a psychiatrist, to examine appellant. At trial, appellant raised the affirmative defense of insanity which the jury implicitly rejected by its guilty verdict. Appellant perfected this appeal after the trial court rendered judgment on the jury's verdict and sentenced appellant to life in prison. Appellant's only contention on appeal is that the jury's rejection of his insanity plea was against the great weight and preponderance of the evidence. When assessing whether an appellant has proved his or her affirmative defense of insanity by a preponderance of the evidence, we consider all the evidence and determine whether "the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust." *Clewis v. State*, 922 S.W.2d 126, 132 (Tex.Crim.App. 1996) (citing *Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Crim.App.1990)). Accordingly, we will summarize all the evidence relevant to appellant's insanity plea.

The first witness called by the State was Sergeant Richard Maxwell. Maxwell performed the follow-up investigation on appellant's case for the police department, but he had no contact with appellant. Accordingly, Maxwell had no personal knowledge relevant to appellant's sanity during the incident.

The State next called Fermina Garcia, Mary Walker, Michael Kaler, and Arnold Ramirez, who were working at South Park Manor Nursing Home when the incident occurred. These witnesses testified that appellant's behavior was very odd, nonresponsive, and inexplicably violent. Kaler, the charge nurse who eventually subdued appellant, testified that appellant "had a glazed look in his eyes" and that it seemed as if appellant "wasn't real sure of where he was."

■ Finally, the State called Yvonne Younts, who is the complainant's sister. Younts testified regarding the complainant's disability and his injury caused by appellant's conduct, but she had no personal knowledge relevant to appellant's sanity during the incident.

The defense called Drs. Klaas and Kutnick, who both testified that at the time of the offense appellant did not know his conduct was wrong because he was experiencing an acute psychotic delusion as a result of paranoid schizophrenia. On cross-examination, the State questioned the doctors as to the possibility that appellant was faking his mental disease. Drs. Klaas and Kutnick independently concluded that this was unlikely.

In the course of cross-examination, the State established that neither doctor had been aware that appellant was released from Southside Health Center only hours before he was arrested at South Park Manor Nursing Home. The State established these earlier events by introducing appellant's medical records. On the morning before the incident at the nursing home, appellant was arrested while running naked through the streets. During his arrest, appellant cut his hand and was brought to Memorial Medical Center. The doctors at Memorial sutured appellant's cut and noted in their medical records that appellant was delusional and exhibiting symptoms of schizophrenia. Consequently, the doctors at Memorial referred appellant to Southside for a psychiatric evaluation. The appellate record in this case contains no medical record of appellant's evaluation at Southside. After appellant was arrested at the nursing home, however, he was readmitted to Memorial and the appellate record includes medical records from appellant's second admission to Memorial. These records indicate that appellant was dismissed from Southside under his own recognizance and that he was experiencing acute psychosis hours later when he was readmitted to Memorial.

Despite the strong evidence of insanity, the State urges that the jury properly rejected appellant's insanity plea in light of evidence that the doctors at Southside apparently considered appellant sufficiently sane to dismiss him. As discussed above, however, the appellate record contains no evaluation from any doctor at Southside. There is nothing in the record to indicate why appellant was released from Southside. Moreover, this issue was expressly addressed by Drs. Klaas and Kutnick. Dr. Kutnick explained that underfunded hospitals like Southside are sometimes limited to admitting only patients who are manifestly dangerous to themselves or others. Consequently, Southside sometimes releases patients who are "severely mentally ill" because they do not manifest an immediate threat of danger. Independently, Dr. Klaas reached the same conclusion regarding Southside's admission criteria. In light of the testimony from Drs. Klaas and Kutnick, and in the absence of any records from Southside, evidence that appellant was dismissed from Southside has little bearing on the issue of appellant's sanity at the time of the offense.

The State further argues that the jury's implicit rejection of appellant's plea of insanity was properly based on evidence that appellant offered somewhat varying explanations of his delusion. The nurse's log at Memorial indicated appellant explained his conduct by stating he was on a "mission from God." While being examined by Dr. Kutnick, however, appellant said that he was acting in response to a voice that told him a woman was buried alive and that she would die unless appellant attacked someone. Finally, appellant told Dr. Klaas that he had only confused and incomplete recollections of the incident. Although Drs. Klaas and Kutnick testified that discrepancies in a patient's story might possibly indicate that the patient was faking mental illness, both doctors further explained that inconsistencies were also common in cases of genuine mental illness because of the patient's confused mental processes. Drs. Klaas and Kutnick each concluded it was unlikely that appellant was faking his symptoms of mental illness despite the inconsistencies alleged by the State. Moreover, the doctors' conclusions are sup-

ported both by the nurses' testimony regarding appellant's odd behavior at the nursing home and by the medical record of acute psychosis when appellant was readmitted to Memorial. Balanced against all the evidence of insanity, the alleged discrepancies in appellant's explanation of his delusions do not indicate that he was sane at the time of the offense.

Next, the State urges that the jury properly rejected appellant's insanity plea in light of evidence that appellant felt remorse for his actions immediately after he committed the offense. The sole basis for this contention is the following brief entry from appellant's medical records: "Patient asked me, 'How's the guy I hit?'" This question shows that appellant was curious about the complainant's condition, but it does not show remorse. Moreover, the medical record that notes appellant's curiosity about the complainant's condition also unambiguously shows appellant's statement that he was acting on a "mission from God." Considered in their entirety and in light of the whole appellate record, appellant's medical records offer little evidence of appellant's remorse or his sanity at the time of the offense.

Finally, the State argues that the *DeGarmo* doctrine precludes appellant from challenging the jury's rejection of his insanity plea. *See DeGarmo v. State,* 691 S.W.2d 657, 661 (Tex.Crim.App.), *cert. denied,* 474 U.S. 973, 106 S.Ct. 337, 88 L.Ed.2d 322 (1985) (admission of guilt at punishment phase of trial is tantamount to entry of guilty plea and waives right to review of evidentiary sufficiency). We disagree.

Neither appellant nor the State cited any cases applying the *DeGarmo* doctrine in the context of a trial where the defendant raised an insanity defense, and the case law we have found offers no guidance. However, the Court of Criminal Appeals has held that an analysis under *DeGarmo* requires close examination to "ensure that a judicial confession was, in fact, given." *McGlothlin v. State,* 896 S.W.2d 183, 188 (Tex.Crim.App. 1995). In this case, appellant's postarrest treatment with neuroleptic medication caused a stabilized remission of his psychosis. Ap-

pellant was restored to sanity and competence when he testified at the punishment phase of his trial, and he expressed remorse for his actions. Although appellant admitted committing the acts underlying the offense, he steadfastly denied that he was sane at that time. In this context, his admission of guilt at the punishment phase was clearly not a waiver of his insanity plea. Accordingly, we hold that the *DeGarmo* doctrine does not preclude appellant's challenge to the jury's rejection of his insanity defense as being against the great weight and preponderance of the evidence.

Having considered all the evidence as well as each contention raised by the State, we hold that the jury's implicit rejection of appellant's affirmative defense of insanity is so against the great weight and preponderance of the evidence so as to be manifestly unjust. Accordingly, we sustain appellant's sole point of error, REVERSE the trial court's judgment, and REMAND this case for a new trial.