COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-07-066-CR

 

 

JAMES ALLEN GROVE                                                          APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

              FROM THE 90TH DISTRICT COURT OF YOUNG COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








A jury convicted Appellant James Allen Grove of
attempted capital murder and assessed his punishment at life imprisonment.  The trial court sentenced him
accordingly.  In four issues, Appellant
challenges the legal and factual sufficiency of the evidence and the trial
court=s order
granting the State=s motion to change venue.  Because we hold that the evidence is legally
and factually sufficient and that the trial court did not abuse its discretion
by changing venue, we affirm the trial court=s
judgment.

 

Statement of Facts

The evidence shows that on the afternoon of May
21, 2006, Appellant and his dog walked down the streets of Breckenridge,
Stephens County, Texas. Appellant was carrying a double-bladed ax.  He told a neighbor who lived less than a
block from him Athat he was tired of all the
electronic BS [and] that he was heading down to the police station and was
going to take care of business and kill somebody.@  Appellant had a Anormal@ look on
his face.  After the conversation,
Appellant walked south.  The neighbor
called the police department to report that Appellant Awas
coming down with an ax to take care of the electronics@ and
also mentioned the dog, but he did not say anything about Appellant=s threat
to kill anyone.  

Meanwhile, Appellant told another neighbor who
lived south of him and who also saw him walking down the street and carrying an
ax that he was Agoing to go up to the police
department and get rid of some of them cops down there.@  His demeanor was Anormal.@  That neighbor did not have a telephone, so
she drove to the courthouse to let the police know that Appellant was
coming.  By the time she got there, she
heard gunshots, so she knew that something had already happened. 








DPS Trooper Grant Atkinson, the complainant, was
in the dispatch office of the Breckenridge Police Department when the call came
in.  He was wearing his uniform.  Soon after the dispatcher radioed the
information to other officers and requested assistance, Atkinson saw Appellant
outside, on the other side of the police station=s outer
door.  As Atkinson walked from the
interior door to the outer door, he saw Appellant turn around and head away
from the building.  But when Atkinson
exited the building, Appellant turned back around, facing him.  Atkinson drew his pistol and repeatedly
screamed at Appellant, who was about twelve feet away, to drop the ax.  Then Appellant yelled, AShoot
me . . . [;] just shoot me.@  

At that point, Appellant was holding the ax over
his shoulder.  But as the incident
progressed, Appellant Apulled the ax down in front of
him, put both hands on it, and took a step towards [Atkinson].  The blade was pointing towards [Atkinson]
like in a woodchopper stance, and . . . 
that . . . is when [Atkinson] fired [his] weapon.@  Appellant did not drop the ax until after the
third shot.  








Atkinson answered affirmatively when asked
whether Appellant was close enough to him that he could have gotten to Atkinson
really fast.  Atkinson also testified
that he was trained about a Asphere
of capability,@ or area around him in which he
needed to be careful because he could be injured before he would be able to
shoot, and that Appellant was within that sphere.  Atkinson described Appellant=s action
in stepping forward with the ax as fast and aggressive but conceded that Appellant
did not swing the ax at him, verbally threaten to kill him, or injure him.  But Atkinson also testified that after
Appellant raised the ax in an aggressive manner, he believed that Appellant was
about to attack him with it, that Appellant was about to hit him with the ax,
and that A[h]e could have even thrown the
ax.@  Atkinson fired the first shot when Appellant Ahad
positioned [the ax] in front of him with the blade pointed towards [Atkinson].@  

John Williams, a firefighter who was standing
behind Atkinson during the incident, testified that at first, Appellant turned
around with his back to Atkinson while Atkinson still had his gun pointed at
Appellant and was telling him to drop it, but then Appellant suddenly turned to
face them again with the ax raised. 
Appellant had a Areal belligerent look on his
face@ when he
took a step towards them Awith the ax raised up.@  He also testified that Appellant had Achoked
up@ on the
ax and was in the process of taking another step toward them before Atkinson
shot him.  








The crime scene investigator, a Texas Ranger,
determined that Appellant had been standing about twelve and a half feet from
Atkinson when Atkinson shot him and that when an edged weapon is involved, the Adanger
zone@ is
considered to be a distance of twenty-one feet. 
He also testified that an ax is a deadly weapon. 

The EMS paramedic who transported Appellant to
the hospital testified that Appellant told him during the ride that his father
had been shot, that now he was just like his dad, and that Appellant had gotten
what he wanted. 

Appellant has a history of mental illness.  Evidence shows that before the offense, he
had been in and out of treatment facilities from 1996 to January 2004, that he
had been diagnosed with A[b]ipolar I disorder, manic
phase, severe with psychotic features; caffeine-induced anxiety disorder;
alcohol dependence; [and] sexual disorder, not otherwise specified,@ and at
another time had been diagnosed with schizophrenia, paranoid-type.  After the offense he was diagnosed with, A[s]chizoaffective
disorder, largely remitted with treatment[, t]he most recent episode manic,@ a
personality disorder, not otherwise specified, with paranoid traits, and Aalcohol
dependence in remission.@ 
There was also evidence that bipolar disorder can be controlled by
medication but does not go away.  








The evidence showes that Appellant had tried to
hang himself while in jail in 2004.  His
half-brother, who lived out of state, testified that when he visited Appellant
within the three years preceding trial, he found that Appellant was living in a
house without running water and without enough food.  Appellant had torn all the water pipes out of
his house after an altercation with the water department.  

About two months before the offense before this
court, Appellant had told a neighbor that the police and FBI had been bugging
his house and had previously yelled to other neighbors Ato stop
sending radio waves to his mind.@  Appellant told the nurse who treated him
while he was confined in jail for this offense that he heard voices and saw
UFOs and that we have aliens on Earth. 

Michael Jumes, the Director of Psychology at the
North Texas State Hospital, reviewed Appellant=s
previous psychiatric records, and he also evaluated Appellant after the
offense.  Jumes testified that he
believed that Appellant=s mental illness is Aconsistent
with a mental disease under . . . the statute that defines
insanity@ but
also testified that Appellant Ahad the
capacity to appreciate that his behavior was wrong and that it was provocative
and consequently it would have consequences.@  Jack Price, the State=s
expert, testified that at the time of his evaluation of Appellant for trial,
Appellant said, AI know what=s right
and wrong.  I know the law.  Shooting a gun at another person is
wrong.  Driving while intoxicated is
wrong.  Public intoxication is
wrong.  Assault and battery is wrong.  Taking an ax to the police department is
wrong.  It=s a
deadly weapon.@ 
Price also opined,








[T]here was nothing, no mental illness, so severe
that it would have precluded him at the time from knowing right from
wrong.  He did have some symptoms of
mental illness.  He was paranoid.  He did have some really bizarre ideas, but
none of them that I was able to find any evidence of had any connection to not
knowing [that] taking an ax to the police department and threatening them is
wrong.  

Sufficient Evidence to
Show that Appellant Attempted to Strike Atkinson

In his second issue, Appellant contends that the
evidence is legally and factually insufficient to show that he attempted to
strike the complainant with an ax on May 21, 2006, as alleged in the
indictment.  Appellant concedes that he
stepped toward Atkinson with the ax raised but claims that he did not position
himself close enough to the trooper to actually hit him and that there is no
evidence that he swung the ax or attempted to strike the trooper with the ax.








Section 15.01 of the penal code provides that a
person commits the offense of criminal attempt if, Awith
specific intent to commit an offense, he does an act amounting to more than
mere preparation that tends but fails to effect the commission of the offense
intended.@[2]  Applying the appropriate standards of review,[3]
we conclude that the evidence that Appellant brought the ax up into a
woodchopping stance and advanced on Atkinson, penetrating the danger zone, is
legally and factually sufficient to show that Appellant attempted to strike
Atkinson with the ax.  We overrule
Appellant=s second issue.

Sufficient Evidence of
Appellant=s Specific Intent to Kill Atkinson

In his third issue, Appellant contends that the
evidence is legally and factually insufficient to show that he specifically
intended to kill the complainant on May 21, 2006.  Appellant contends that he did not have the
specific intent to kill anyone at the police station but instead wanted the
police to kill him, as evidenced by his repeated entreaties to Atkinson and his
statements to the paramedic and psychiatric professionals after the
incident.  In addition to this testimony,
however, the jury heard that Appellant had told one neighbor that he was headed
to the police station to Akill somebody@ and had
told another one that he Awas going to go up to the police
department and get rid of some of them cops down there.@








Appellant also argues that the State failed to
prove that he had the requisite state of mind at the time of his offense
because of Athe overwhelming evidence of his
diminished capacity.@ 
As the Texas Court of Criminal Appeals has pointed out, 

Texas does not recognize
diminished capacity as an affirmative defense i.e., a lesser form of the
defense of insanity.  In contrast, the
diminished‑capacity doctrine at issue in this case is simply a failure‑of‑proof
defense in which the defendant claims that the State failed to prove that the
defendant had the required state of mind at the time of the offense.[4]

 

The jury was the sole judge of the credibility of the evidence.[5]  Based on the evidence detailed above, and
applying the appropriate standards of review,[6]
we hold that the evidence is legally and factually sufficient to show that
Appellant had the requisite specific intent to commit capital murder.  We overrule Appellant=s third
issue.

Sufficient Evidence to
Support Jury=s Rejection of Insanity Defense








In his
fourth issue, Appellant contends that the jury=s
rejection of his insanity defense was so against the great weight and
preponderance of the evidence as to be manifestly unjust.  Section 8.01(a) of the penal code provides
that A[i]t is
an affirmative defense to prosecution that, at the time of the conduct charged,
the actor, as a result of severe mental disease or defect, did not know that
his conduct was wrong.@[7]  Appellant alleges that he has proved by a
preponderance of the evidence that he was insane at the time of the alleged
offense and that he has shown that, at the time of the offense and as the
result of his mental illness, he did not know that his conduct was wrong.  Our review of the record, however, does not
reveal any evidence that Appellant did not know that his conduct was wrong at
the time of the act, nor does Appellant point to any such evidence.  Based on the applicable standard of review,[8]
we hold that the verdict is not so against the great weight of the evidence as
to be manifestly unjust.  We overrule
Appellant=s fourth issue.

Change of Venue Within Trial Court=s
Discretion

In his
first issue, Appellant contends that the trial court abused its discretion by
granting the State=s motion to change venue.  Article 31.02 of the code of criminal
procedure provides,








Whenever
the district or county attorney shall represent in writing to the court before
which any felony or misdemeanor case punishable by confinement, is pending,
that, by reason of existing combinations or influences in favor of the accused,
. . . a fair and impartial trial as between the accused and the State cannot be
safely and speedily had; . . . the judge shall hear proof in relation thereto,
and if satisfied that such representation is well‑founded and that the
ends of public justice will be subserved thereby, he shall order a change of
venue to any county in the judicial district in which such county is located or
in an adjoining district.[9]

We
review the trial court=s ruling on the State=s motion
to change venue for an abuse of discretion.[10]  








After
Appellant filed a notice of his intent to raise the insanity defense, the State
filed its motion to change venue, contending that because of Aexisting
combinations and influences in [Stephens County] in favor of [Appellant], . . .
a fair and impartial trial@ could
not be had there.  As Appellant
acknowledges, a local grocery store owner testified that he thought Appellant
had mental issues because he had seen Appellant riding a bicycle while wearing
a dress.  The witness testified that he
believed others in the community held the same opinion.  A legal secretary also testified that she
thought Appellant had mental problems because she saw him riding a bicycle
while wearing a dress.  The Sheriff of
Stephens County testified that most people in Breckenridge were familiar with
Appellant and would be predisposed to believe that he had mental health
issues.  

Appellant
argues that A[t]he testimony elicited from
the witnesses did not show any favoritism in the community on [his] behalf . .
. [;] to the contrary, the opinions were that [he] was looked on with disdain
and disfavor.@ 
Given his plan to raise the insanity defense, however, the Breckenridge
citizens= beliefs
that he had mental heath issues could reasonably be seen as Ainfluences
in favor of the accused.@[11]  We therefore hold that the trial court did
not abuse its discretion by changing venue to Young County and overrule
Appellant=s first issue.

Conclusion

Having
overruled all of Appellant=s
issues, we affirm the trial court=s
judgment. 

PER
CURIAM

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

DELIVERED:  August 26, 2008











[1]See Tex. R. App. P. 47.4.





[2]Tex.
Penal Code Ann.
' 15.01(a) (Vernon 2003).





[3]See Jackson v. Virginia, 443 U.S. 307, 319, 99
S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778 (Tex.
Crim. App. 2007) (both providing legal sufficiency standard of review); Watson
v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005); Sims v. State, 99 S.W.3d
600, 603 (Tex. Crim. App. 2003); Johnson v. State, 23 S.W.3d 1,
11 (Tex. Crim. App. 2000) (all providing factual sufficiency standard of
review).

 





[4]Jackson v. State, 160 S.W.3d 568, 573
(Tex. Crim. App. 2005).





[5]Jackson, 443 U.S. at 319, 99 S.
Ct. at 2789; Clayton, 235 S.W.3d at 778; Johnson, 23 S.W.3d at 8B9.





[6]See Jackson, 443 U.S. at 319, 99 S.
Ct. at 2789; Clayton, 235 S.W.3d at 778 (both providing legal sufficiency
standard of review); Watson, 204 S.W.3d at 414; Drichas, 175
S.W.3d at 799; Sims, 99 S.W.3d at 603; Johnson, 23 S.W.3d at 11
(all providing factual sufficiency standard of review).





[7]Tex.
Penal Code Ann.
' 8.01(a) (Vernon 2003).





[8]See Meraz v. State, 785 S.W.2d 146, 154B55 & n.2 (Tex. Crim.
App. 1990).





[9]Tex.
Code Crim. Proc. Ann. art. 31.02 (Vernon 2006).





[10]See Aranda v. State, 736 S.W.2d 702, 705
(Tex. Crim. App. 1987), cert. denied, 487 U.S. 1241 (1988); Gregory
v. State, 37 S.W. 752, 752 (Tex. Crim. App. 1896).





[11]See Tex. Code Crim. Proc. Ann. art. 31.02.